UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

STEVES AND SONS, INC.

         Plaintiffs,

v.

JELD-WEN, INC.,

         Defendant.

Serve:   CT Corporation
           4701 Cox Road, Suite 285
           Glen Allen, Virginia 23060

Civil Action No. 3:25-cv-252

## COMPLAINT

Despite this Court's past orders in response to Defendant JELD-WEN, Inc.'s ("JELD-WEN") recalcitrant behavior—granting judgment against it for violating the Clayton Antitrust Act and breaching its contract with Plaintiff Steves and Sons, Inc. ("Steves"), awarding Steves tens of millions of dollars in treble damages, ordering JELD-WEN to divest the doorskin manufacturing plant it acquired in its unlawful acquisition of its competitor,[1] and awarding Steves additional damages because of JELD-WEN's refusal to conform its conduct to be consistent with these multiple adverse judicial determinations[2]—JELD-WEN continues to breach its contractual commitments. JELD-WEN leaves Steves no choice but to request that this Court, yet again, require JED-WEN to honor its contractual obligations.

Most recently, JELD-WEN has refused to ███████████████████████ ███████████████████ under the long-term supply agreement between Steves and JELD-

---

[1] *Steves and Sons, Inc. v. JELD-WEN, Inc.*, 3:16-cv-545, ECF No. 1852, Mar. 13, 2019 (E.D. Va.).

[2] *Steves and Sons, Inc. v. JELD-WEN, Inc.*, 3:16-cv-545, ECF No. 1981, Nov. 19, 2019 (E.D. Va.).

WEN that remained effective through divestiture (the "2020 LTA"). JELD-WEN premises its refusal on the Asset Purchase Agreement and related agreements it entered into with WG Towanda LLC and Woodgrain, Inc. (collectively, "Woodgrain") to effectuate the divestiture (collectively, the "APA")—agreements to which Steves is largely a stranger. According to JELD-WEN, ███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████

Woodgrain maintains that it did not agree under the APA ████████████████

██████████████████████████████. As a result, Woodgrain filed a Complaint in this Court earlier this week asserting that JELD-WEN's position breaches the APA and seeking a declaratory judgment that JELD-WEN, not Woodgrain, ████████████████. Steves brings this separate suit to present the additional argument that Steves' agreement with JELD-WEN—the 2020 LTA—also yields that same result: the 2020 LTA ████████████████████████████

████████████████████████████████████████—███ JELD-WEN never requested and Steves never provided.

At bottom, all agree that Steves is entitled to ████████████████████████████

████████████. The question is only *who* is required to ████████████████. Accordingly, Steves seeks declaratory relief to clarify its rights and JELD-WEN's obligations under the 2020 LTA as they relate to the obligation to ██████████████████████████████. Neither JELD-WEN nor Woodgrain disputes the existence of this obligation. The only issue before this Court is who bears responsibility for providing that ████████████. Steves further seeks its ████████

████████████████████████████████████████.

## THE PARTIES, JURISDICTION, AND VENUE

1. Steves is a Texas corporation headquartered in Texas. For purposes of 28 U.S.C. § 1332(a), Steves is a citizen of Texas.

2

2.　　JELD-WEN is a Delaware corporation headquartered in North Carolina. For purposes of 28 U.S.C. § 1332(a), JELD-WEN is a citizen of Delaware and North Carolina.

3.　　This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the amount in controversy as measured by the value of the object of the litigation—████████████████████████████████████████—exceeds $75,000, exclusive of interest and costs, and complete diversity of citizenship exists between Steves and JELD-WEN.

4.　　This Court has personal jurisdiction over JELD-WEN. ████████████████████████████████████████████████████████████████████████████████████████████████████████.

5.　　Venue is proper in this District because JELD-WEN and Steves agreed ████████████████████████████████████████████████████████████████████████████.

## FACTUAL BACKGROUND

**A.　　The Previous Litigation**

**1.　　JELD-WEN Was Found Liable for Antitrust Violations and Breach of Its Contract with Steves.**

6.　　Steves, an independent manufacturer of interior molded doors, primarily relies on external suppliers for the doorskins needed to make those doors.

7.　　In June 2016, Steves sued JELD-WEN in this Court, alleging that JELD-WEN violated Section 7 of the Clayton Act, 15 U.S.C. § 18, and breached the then-existing long-term doorskin supply agreement between them ("the 2012 LTA"). Steves based the lawsuit on JELD-WEN's unlawful acquisition of a competitor in the doorskin market, Craftmaster International, and anti-competitive conduct following the acquisition.

8. For example, soon after the only other remaining U.S.-based doorskin supplier announced that it would stop selling doorskins to independents like Steves, JELD-WEN began to engage in certain anti-competitive behavior: refusing to honor the 2012 LTA's terms and conditions for setting doorskin prices, charging higher prices than the 2012 LTA authorized, refusing to sell certain doorskin models to Steves altogether, and providing Steves with lower-quality doorskins. This behavior continued unabated despite Steves' complaints, leaving Steves with no alternative but to file the June 2016 lawsuit.

9. A jury found JELD-WEN liable for violating the antitrust laws and breaching the 2012 LTA and, as a result, awarded Steves trebled damages of $36,455,619 for past harm caused by JELD-WEN's antitrust violations and $9,933,602 for JELD-WEN's breach of contract.[3]

10. Following a three-day evidentiary hearing on equitable remedies, this Court ordered that JELD-WEN divest the doorskin manufacturing facility located in Towanda, Pennsylvania that JELD-WEN acquired as part of the unlawful merger ("Towanda").[4]

### 2. JELD-WEN's Misconduct Continued After the Jury's Verdict.

11. Despite the jury verdict finding that JELD-WEN had overcharged Steves for doorskins, JELD-WEN continued to overcharge Steves in much the same manner as it had before the verdict and this Court's divestiture decision.

12. As a result, Steves moved for, and the Court awarded, an additional $7,083,013 for JELD-WEN's continuing overcharges.[5]

---

[3] *Steves and Sons, Inc. v. JELD-WEN, Inc.*, 3:16-cv-545, ECF No. 1815, Dec. 14, 2018 (E.D. Va.).

[4] *Id.*

[5] *Steves and Sons, Inc. v. JELD-WEN, Inc.*, 3:16-cv-545, ECF No. 1981, Nov. 19, 2019 (E.D. Va.).

B.     **The 2020 LTA**

13.     Effective June 2, 2020, JELD-WEN and Steves entered into an Amended Molded Doorskin Agreement ("the AMDA"), which superseded all previous doorskin supply agreements between the two companies.

14.     On November 30, 2020, Steves and JELD-WEN amended certain aspects of the AMDA's ordering provisions and allocation rights via a letter agreement (the "Amendment").

15.     On April 5, 2021, the Court approved a stipulation filed by JELD-WEN and Steves to extend the AMDA as amended until divestiture was complete and a new supply agreement was in effect between Steves and the company that acquired Towanda (the "Stipulation").[6]

16.     Collectively, the AMDA, Amendment, and Stipulation comprise the 2020 LTA.

17.     Steves brings this action to clarify its rights and JELD-WEN's obligations under the 2020 LTA. Several provisions of the 2020 LTA directly bear on the issues presented.

18.     First, Steves could order up to ███████████ from JELD-WEN. The 2020 LTA generally required JELD-WEN to deliver them ███████, though it also allowed ███████████████ for certain doorskins.

19.     Second, the 2020 LTA contained a ████ provision requiring that JELD-WEN's doorskins ████████████. If the doorskins failed to ████████████, JELD-WEN was ████████████████████████████████████████████████████████████████.

20.     Third, the 2020 LTA ████████████████████████████████ under the agreement without ████████████████████████████████ ████████████████████████████████████████████████████.

---

[6] *Steves and Sons, Inc. v. JELD-WEN, Inc.*, 3:16-cv-545, ECF No. 2110, Apr. 5, 2021 (E.D. Va.).

5

███████████████████████████████████████████████████████

█████████████."

21.     Fourth, the 2020 LTA required a ████████████████████████████

██████████████████████████████████████████████████████████████████████

██████.

22.     Finally, the parties agreed that the 2020 LTA was subject to ████████

████████████████████████████████████████████, and allows for the ████████

███████████████████████████████████████ in any action arising out of the

agreement.

C.      **The APA**

23.     JELD-WEN and Woodgrain entered into the APA effective January 17, 2025

pursuant to this Court's order requiring JELD-WEN to divest Towanda.[7]

24.     Before it was finalized, the Court provided Steves an opportunity to review and

object to selected portions of the APA.

25.     Steves and its counsel received versions of the APA with different levels of

redaction for review. The version of the APA provided to Steves' counsel excluded the APA's

Disclosure Schedules and contained redactions to portions of the ancillary agreements; the version

of the APA provided to Steves' senior executives was redacted in its entirety with the exception

of the ancillary agreement in Exhibit F—the "Amended and Restated Molded Doorskin Product

---

[7] Steves understands that the version of the APA signed by JELD-WEN and Woodgrain is not consistent with the version that this Court approved on December 13, 2024. *See Steves and Sons, Inc. v. JELD-WEN, Inc.*, 3:16-cv-545, ECF No. 2662, Dec. 13, 2024 (E.D. Va.). Steves further understands that Woodgrain is in communication with JELD-WEN to ensure that the Court-approved APA is signed, but that none of the differences between the Court-approved APA and the version that Woodgrain and JELD-WEN signed is material to the issues addressed herein.

Agreement" that JELD-WEN and Steves negotiated for assignment to the acquirer of Towanda upon the completion of the divestiture transaction (the "2025 LTA")—and a portion of the ancillary agreement in Exhibit E, i.e., the "Transition Supply Agreement." Neither Steves nor its counsel ever received portions of the APA, including the Disclosure Schedules, that would have been necessary to determine whether JELD-WEN was purporting to ███████████ ███████████████████████. Nor did JELD-WEN ever disclose to Steves that it intended to do so.

26. In response to Steves' request that its counsel have access to an unredacted version of the APA, including its Disclosure Schedules, to fully review and (if appropriate) develop its objections,[8] JELD-WEN and Woodgrain opposed that request,[9] and the Court ultimately denied it.[10] Steves has yet to have access to the APA Disclosure Schedules.

27. The APA ancillary agreement at Exhibit F—the 2025 LTA—specifically provides ████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████.

**D.   JELD-WEN's Renunciation of Its Obligation to Reimburse Steves for Defective Doorskins**

28. In the weeks leading up to the January 17, 2025 divestiture, Steves continued to submit purchase orders for doorskins to JELD-WEN under the terms of the 2020 LTA.

29. When Steves received the doorskins delivered under those purchase orders, it followed its normal practice of marking the doorskins with a color to signify that they were

---

[8] *Steves and Sons, Inc. v. JELD-WEN, Inc.*, 3:16-cv-545, ECF No. 2576, Nov. 12, 2024 (E.D. Va.).

[9] *Steves and Sons, Inc. v. JELD-WEN, Inc.*, 3:16-cv-545, ECF No. 2582, Nov. 12, 2024 (E.D. Va.).

[10] *Steves and Sons, Inc. v. JELD-WEN, Inc.*, 3:16-cv-545, ECF No. 2583, Nov. 13, 2024 (E.D. Va.).

manufactured by JELD-WEN, as opposed to another supplier. Steves applied the same color to all JELD-WEN doorskins, regardless of the JELD-WEN facility of origin. By marking the JELD-WEN doorskins in this manner, Steves is able to identify them as JELD-WEN doorskins if they are found to be defective before their eventual use in the manufacture of interior molded doors by Steves.

30. After divestiture, and to Steves' surprise, Steves began to receive invoices from Woodgrain for doorskins delivered pursuant to purchase orders Steves had submitted to JELD-WEN before the divestiture.

31. When Steves discussed this discrepancy with Woodgrain, Steves learned for the first time that JELD-WEN was taking the position that, as of divestiture, it had ▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓. JELD-WEN took this position despite the facts that (a) the 2020 LTA ▓▓▓▓▓▓ such an ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓; (b) the 2025 LTA ▓▓▓▓▓▓ Woodgrain of any ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓; and (c) Woodgrain denied that it acquired these obligations.

32. In response, Steves advised JELD-WEN that Steves would pay the invoices related to purchase orders submitted to JELD-WEN before divestiture but delivered by Woodgrain after divestiture only if JELD-WEN continued to honor its obligations with respect to those doorskins. In particular, Steves insisted that JELD-WEN continue to meet its obligation ▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. Steves asked JELD-WEN confirm its agreement.

33. When JELD-WEN did not respond, counsel for Steves informed JELD-WEN's counsel of the issue and asked that she address it with the appropriate person(s) at JELD-WEN. In so doing, Steves noted that it had received thousands of doorskins pursuant to the purchase orders

submitted to JELD-WEN before divestiture, had designated them as JELD-WEN doorskins, and had integrated them into Steves' inventory. Steves could not identify and redesignate the subject doorskins as Woodgrain doorskins without substantial time and expense, if at all.

34. In response, JELD-WEN's counsel informed Steves' and Woodgrain's counsel that JELD-WEN would not agree with Steves' proposal. JELD-WEN took the position that Woodgrain ████████████████████████████████████████████████████████████████████████ ████████████████████. Therefore, according to JELD-WEN, Woodgrain assumed any and all ████████████████████████████████████████ regardless of whether they were delivered pursuant to a purchase order to JELD-WEN or Woodgrain, whether they were delivered pre- or post-divestiture, and whether they were manufactured at Towanda or another JELD-WEN plant.

35. In the months preceding divestiture, the rate of defective doorskins delivered to Steves from Towanda reached unprecedented highs. Based on that fact and the number of JELD-WEN-designated doorskins in Steves' inventory, Steves expects the cost of reimbursement for the defective doorskins at issue to exceed $3 million.

E.  **Steves' Compliance with Its Dispute Resolution Obligations Under the 2020 LTA**

36. On March 17, 2025, Steves gave JELD-WEN notice of a dispute regarding JELD-WEN's obligations for doorskins delivered to Steves under the 2020 LTA, including the obligation to ████████████████████████████████████.

37. Despite the passage of more than 10 days since Steves provided notice, JELD-WEN has not provided a substantive response to Steves' notice of a dispute.

F.  **Woodgrain Sues JELD-WEN**

38. On March 26, 2025, Woodgrain filed a complaint in this Court, Civil Action No. 3:25-cv-00243, asserting claims against JELD-WEN for breach of contract and declaratory judgment.

9

39. Woodgrain alleges that JELD-WEN materially breached the APA by failing to disclose the liability associated with ███████████████████████████████ ███████████████.

40. Woodgrain further seeks a declaratory judgment that (a) JELD-WEN did not assign ███████████ to Woodgrain, and Woodgrain did not assume ███████████; (b) ███████████████████████████████████████████████; (c) ███████████████████████████████████████████████████████████ and, therefore, did not transfer to Woodgrain; (d) any such liability would have ███████████ ███████████ under the terms of the APA; and (e) JELD-WEN remains responsible for any such liability.

## CLAIM FOR RELIEF

### COUNT ONE
Declaratory Judgment
(28 U.S.C. § 2201)

41. The foregoing allegations are incorporated as though re-alleged herein.

42. An actual controversy has arisen and now exists between Steves and JELD-WEN concerning whether JELD-WEN is obligated to ███████████████████████████████ ███████████████████.

43. Steves contends that the 2020 LTA barred JELD-WEN from ███████████ ███████████████████████████████████████████████████████, which was neither sought by JELD-WEN nor given by Steves.

44. Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, Steves is entitled to a declaration that:

- Steves' opportunity to review and object to selected portions of the APA did not ███████████████████████████████████████ ███████████████ ; and

- JELD-WEN retains all contractual obligations as to doorskins delivered to Steves pursuant to purchase orders Steves issued to JELD-WEN under the 2020 LTA, including the obligation ███████████████████████████ .

## PRAYER FOR RELIEF

Wherefore, Plaintiff, Steves and Sons, Inc. requests that the Court grant it the following relief:

- appropriate declaratory relief as set forth in its claim;

- an award of its reasonable costs and attorney's fees in this action pursuant to § 12 of the 2020 LTA; and

- such other relief as this Court deems just and proper.

Dated: March 31, 2025

    Respectfully submitted,

    STEVES AND SONS, INC.

    By:   /s/Maya M. Eckstein
    Lewis F. Powell III (VSB No. 18266)
    Maya M. Eckstein VSB No. 41413)
    HUNTON ANDREWS KURTH LLP
    Riverfront Plaza, East Tower
    951 East Byrd Street
    Richmond, Virginia 23219-4074
    Telephone: (804) 788-8200
    Facsimile: (804) 788-8218
    lpowell@hunton.com
    meckstein@hunton.com

    Glenn D. Pomerantz (pro hac vice pending)
    MUNGER, TOLLES & OLSON LLP
    350 S. Grand Avenue, 50th Floor

Los Angeles, CA 90071
Telephone: (213) 683-9132
Facsimile: (213) 683-5161
Glenn.Pomerantz@mto.com

*Attorneys for Plaintiff Steves and Sons, Inc.*